XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
P. PATTY LI
Deputy Attorney General
State Bar No. 266937
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3817
  Fax:  (415) 703-1234
  E-mail:  Patty.Li@doj.ca.gov
*Attorneys for Defendants Edmund G. Brown Jr. and
Alex Padilla*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAUL RODRIGUEZ; ROCKY CHAVEZ; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; and CALIFORNIA LEAGUE OF UNITED LATIN AMERICAN CITIZENS,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**JERRY BROWN, in his official capacity as Governor of the State of California; and ALEX PADILLA, in his official capacity as Secretary of State of the State of California,**<br><br>Defendants. | 2:18-cv-001422-CBM-ASx<br><br>**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:          July 10, 2018<br>Time:          10:00 a.m.<br>Courtroom:  8B<br>Judge:         The Honorable Consuelo B. Marshall<br><br>Action Filed: February 23, 2018 |

# TABLE OF CONTENTS

**Page**

I.   Plurality Voting in the Selection of California's Presidential
     Electors Does Not Violate "One Person, One Vote" ............................ 1

     A.   The One Person, One Vote Claim is Foreclosed by
          Binding Supreme Court Precedent ............................................ 1

          1.   The Listing of Electors' Names on the Ballot Does
               Not Distinguish McPherson and *Williams*. ...................... 2

          2.   No Subsequent Doctrinal Developments Have
               Undermined *Williams* .......................................................... 4

     B.   California's Method of Selecting Presidential Electors
          Satisfies "One Person, One Vote" Principles. ......................... 6

          1.   The "Two-Step" Theory Ignores Constitutional
               Procedures For the Selection of the President and
               Raises a Non-Justiciable Political Question .................... 6

          2.   The multimember district cases are not relevant,
               and in any event are distinguishable. ............................ 8

II.  Plurality Voting in the Selection of Presidential Electors Does
     Not Violate Associational Rights or Any Other First
     Amendment Rights. .................................................................... 10

     A.   To the Extent Plaintiffs Have Properly Raised Speech and
          Petition Claims, Those Claims Fail as a Matter of Law .......... 10

     B.   Any Burden on Associational Rights Is Minimal or Non-
          Existent, So Strict Scrutiny Does Not Apply. ...................... 12

     C.   Plurality Voting Is Justified by Important Regulatory
          Interests. ................................................................................ 14

III. Conclusion .................................................................................. 15

1

**TABLE OF AUTHORITIES**

2

**Page**

3

4

CASES

5

*Anderson v. Celebrezze*
    460 U.S. 780 (1983) ...................................................................... 14, 15

6

7

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*
    564 U.S. 721 (2011) ............................................................................ 11

8

9

*Borough of Duryea v. Guarnieri*
    564 U.S. 379 (2011) ............................................................................ 12

10

11

*Burdick v. Takushi*
    504 U.S. 428 (1992) ................................................................. 13, 14, 15

12

13

*Burns v. Richardson*
    384 U.S. 73 (1966) ............................................................................ 4, 9

14

15

*Bush v. Gore*
    531 U.S. 98 (2000) ............................................................................ 2, 4

16

17

*Bush v. Palm Beach Cty. Canvassing Bd.*
    531 U.S. 70 (2000) ............................................................................... 2

18

19

*Davis v. Fed. Election Comm'n*
    554 U.S. 724 (2008) ............................................................................ 11

20

*Dudum v. Arntz*
    640 F.3d 1098 (9th Cir. 2011) .............................................................. 14

21

22

*Fortson v. Dorsey*
    379 U.S. 433 (1965) ............................................................................ 4, 9

23

24

*Gordon v. Lance*
    403 U.S. 1 (1971) ................................................................................ 5, 6

25

26

*Graham v. Fong Eu*
    403 F. Supp. 37 (N.D. Cal. 1975) ......................................................... 3, 6

27

28

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4

*Graham v. Fong Eu*
    423 U.S. 1067 (1976) ......................................................................... 3

5
6

*Gray v. Sanders*
    372 U.S. 368 (1963) .................................................................. 4, 5, 6, 7

7
8

*Harris v. Arizona Indep. Redistricting Comm'n*
    136 S. Ct. 1301 (2016) ..................................................................... 4

9
10

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ....................................................................... 12

11

*Mandel v. Bradley*
    432 U.S. 173 (1977) ......................................................................... 2

12
13

*McPherson v. Blacker*
    146 U.S. 1 (1892) ......................................................................... 2, 8

14
15

*Pub. Integrity All., Inc. v. City of Tucson*
    836 F.3d 1019 (9th Cir. 2016) ..................................................... 13, 15

16
17

*Pub. Integrity All., Inc. v. City of Tucson*
    No. CV 15-138-TUC-CKJ, 2015 WL 10791892 (D. Ariz. May 20,
    2015) ........................................................................................... 15

18
19

*Short v. Brown*
    No. 18-15775, 2018 WL 3077070 (9th Cir. June 22, 2018) ........... 5, 14

20
21

*Tashjian v. Republican Party of Connecticut*
    479 U.S. 208 (1986) ....................................................................... 12

22
23

*Whitcomb v. Chavis*
    403 U.S. 124 (1971) ......................................................................... 9

24
25

*White v. Regester*
    412 U.S. 755 (1973) ...................................................................... 4, 9

26
27

*Williams v. Rhodes*
    393 U.S. 23 (1968) ......................................................................... 12

28

# TABLE OF AUTHORITIES
## (continued)

Page

*Williams v. Virginia State Bd. of Elections*
   288 F. Supp. 622 (E.D. Va. 1968)..................................................*passim*

*Williams v. Virginia State Bd. of Elections*
   393 U.S. 320 (1969) ............................................................... 6

*Williams v. Virginia State Bd. of Elections*
   393 U.S. 1112 ....................................................................... 6

STATUTES

Cal. Stats. 1852, Ch. 72 ............................................................. 10

Cal. Stats. 1937, Chapter 398, § 2 ............................................. 3

CONSTITUTIONAL PROVISIONS

United States Constitution
   Article II, § 1, cl. 2...........................................................7, 8, 15
   First Amendment .............................................................*passim*
   Twelfth Amemdment........................................................7, 8
   Fourteenth Amendment ..................................................3, 6, 13

OTHER AUTHORITIES

National Archives and Records Administration, U.S. Electoral
   College, Historical Election Results, Electoral Votes for President
   and Vice President ............................................................ 10

This challenge to California's statutes governing allocation of the State's presidential electors fails as a matter of law, and nothing in Plaintiffs' opposition calls that result into question. The one person, one vote claim is foreclosed by binding Supreme Court precedent. Even if that were not the case, Plaintiffs do not, and cannot, plausibly allege that California's method of allocating all of its electors to the candidate who wins the popular vote either counts votes unequally or significantly burdens anyone's associational rights. Plaintiffs respond that "modern" electoral practices render the relevant Supreme Court precedent invalid; that California runs a "two-step" election that "discards" votes at the first step; and that there is a general First Amendment right to receive campaign attention. These assertions ignore the constitutional framework governing the Electoral College and have no basis in equal protection or First Amendment jurisprudence. The Court should dismiss the Complaint without leave to amend.

## I. PLURALITY VOTING IN THE SELECTION OF CALIFORNIA'S PRESIDENTIAL ELECTORS DOES NOT VIOLATE "ONE PERSON, ONE VOTE"

The one person, one vote claim fails under binding Supreme Court precedent. To the extent the claim relies upon Plaintiffs' novel "two-step" theory of presidential elections, or their erroneous reading of inapposite case law, it also fails on the merits for lack of any factual or legal basis.

### A. The One Person, One Vote Claim is Foreclosed by Binding Supreme Court Precedent

Plaintiffs ask this Court to ignore controlling Supreme Court precedent, arguing that the cases cited in the motion did not consider the "modern" presidential election process, which Plaintiffs call a "two-step election." Opp. at 16-20. Contrary to their contentions, California's system is not materially different than the presidential selection process at issue in those cases. Therefore, those Supreme Court cases control the outcome here and mandate dismissal.

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

### 1. The Listing of Electors' Names on the Ballot Does Not Distinguish *McPherson* and *Williams*.

Plaintiffs argue that the relevant Supreme Court precedent is not binding because the names of individual presidential electors were listed on the ballot, at the time those cases were decided. This is a distinction without a difference, because the listing of electors' names had no impact on the outcome of those cases.

In *McPherson v. Blacker*, 146 U.S. 1 (1892), the Supreme Court considered an equal protection challenge to Michigan's use of the district method for selecting presidential electors. The Court concluded that when—as here—a State allows voters to select electors through a popular election, "no discrimination is made" so long as "each citizen has an equal right to vote." *McPherson*, 146 U.S. at 40. Plaintiffs dismiss *McPherson* as irrelevant because it was decided at a time when Michigan printed the names of individual electors on the ballot. Opp. at 16. But the fact that electors' names appeared on Michigan's ballot played no role in the Court's decision, as the Court made no mention of that fact at all in reaching its holding. *See* 146 U.S. at 35-40, 42. *McPherson* remains good law and controlling authority, as recognized by the Supreme Court in both *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70, 76 (2000), and *Bush v. Gore*, 531 U.S. 98, 104 (2000).

The one person, one vote claim is also directly controlled, and thus foreclosed, by the Supreme Court's summary affirmance of *Williams v. Virginia State Board of Elections*, 288 F. Supp. 622, 626 (E.D. Va. 1968), *aff'd per curiam*, 393 U.S. 320 (1969), *and reh'g denied*, 393 U.S. 1112 (1969). Lower courts must defer to the Supreme Court's summary affirmances and cannot "com[e] to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). The *Williams* summary affirmance controls here because *Williams* rejected a challenge to a method of selecting presidential

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

1    electors identical to California's: all of Virginia's electors were awarded to the

2    winner of the popular vote in that State.

3         Plaintiffs argue that, at the time of *Williams*, the names of the electors were

4    printed on Virginia's presidential election ballot, and that this renders the Supreme

5    Court's summary affirmance meaningless here.  Opp. at 17-18.  More specifically,

6    Plaintiffs contend that because Virginia's election was for presidential electors, and

7    not directly for a presidential candidate, *Williams* did not address "Plaintiffs'

8    primary claim: that a state may not discard votes *for the President* through the

9    [winner-take-all] method of allocating Electors."  *Id*. at 17.

10        This assertion reflects a misunderstanding of Virginia's electoral practices at

11   the time of *Williams*.  As set forth in the *Williams* briefing that Plaintiffs attached to

12   their opposition brief (without requesting judicial notice), the Virginia ballot listed

13   each party's electors, as well as each party's presidential and vice-presidential

14   candidates.  Opp., Ex. A at 4.  Each voter could "vote only for one or another

15   political party, and thus for the party's nominees for President and Vice President,"

16   and "[n]o vote [could] be cast and counted for any elector or electors individually,

17   or separately from the other electors."  *Id*.  Virginia's process for selecting electors

18   was therefore substantively identical to California's current practice of permitting

19   each voter to select the electors associated with only one presidential candidate.[1]

20   *Williams* necessarily rejected the claim that this practice violates one person, one

21   vote principles, and that decision remains controlling authority.[2]

22

23   [1] California has listed only the names of the presidential and vice-presidential
     candidates, and not the names of the individual electors, since the 1940 presidential
24   election.  Cal. Stats. 1937, ch. 398, § 2.

25   [2] Contrary to Plaintiffs' assertions, *Graham v. Fong Eu* remains binding authority
     for the issues that were necessarily decided there.  403 F. Supp. 37 (N.D. Cal.
26   1975), *aff'd per curiam*, 423 U.S. 1067 (1976).  This includes the holding that "the
     California methods of electing delegates to the two major national conventions do
27   not violate the First and Fourteenth Amendment rights of those who vote for losing
     candidates."  403 F. Supp. at 46.  Those methods are substantially the same as those
28   used today for California's general presidential election.  *Id*. at 40-41.

### 2. No Subsequent Doctrinal Developments Have Undermined *Williams*.

Plaintiffs' attempt to demonstrate that intervening doctrinal developments have vitiated the precedential effect of *Williams* also fails. Plaintiffs argue that *Bush v. Gore* "dispensed with invidiousness as an element of a one person, one vote claim," Opp. at 20, but they fail to even acknowledge, let alone distinguish, recent authority holding that the invidiousness requirement continues to apply. *See* Opening Br. at 11-12 (citing *Harris v. Arizona Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1307 (2016)). Plaintiffs also point to Congress's decision to require that House representatives be selected by the district method as a change in the legal landscape (Opp. at 19), but that change was already in place when *Williams* was decided, a fact *Williams* itself acknowledged. *Williams v. Virginia State Bd. of Elections*, 288 F. Supp. at 624. And, Plaintiffs do not explain how the Supreme Court's decision to strike down two specific multimember districts in *White v. Regester* "fundamentally shifted the legal landscape." Opp. at 20. Rather, as the Court found in *White* (and consistent with cases that predate *Williams*), multimember districts are constitutionally permissible unless there is sufficient evidence of invidious vote dilution. *See White v. Regester*, 412 U.S. 755, 765 (1973); *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965), and *Burns v. Richardson*, 384 U.S. 73, 88-89 (1966).

Plaintiffs further insist that *Williams*—and its holding that the unit rule comports with one person, one vote principles—has somehow been undermined by *Gray v. Sanders*, 372 U.S. 368 (1963). But this makes no sense because *Gray* was decided five years *before Williams*. It also mischaracterizes the holding in *Gray*.

Plaintiffs cite footnote 12 of *Gray* for the proposition that it struck down a "two-step" electoral process that "discards" votes at the first step. Opp. at 9. Plaintiffs argue that this footnote effected a sweeping change in the law that would

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

1    have invalidated the method for selecting presidential electors used by every State

2    at the time the case was decided, in 1963.  This cannot be correct.

3          In *Gray*, the Supreme Court struck down Georgia's "county unit" system for

4    political primaries because it valued votes differently based on geographic location.

5    372 U.S. at 379-81.  Under this system, each county received one to three

6    representatives, depending on population, and the winner of each county's popular

7    vote received all of the county's representatives.  *See id.* at 370-71.  This resulted in

8    the State "weight[ing] the rural vote more heavily than the urban vote and

9    weight[ing] some small rural counties heavier than other larger rural counties."  *Id*.

10   at 379.  *Gray* therefore focused on the unequal weighting of votes resulting in

11   geographic discrimination.  *Id*. ("How then can one person be given twice or 10

12   times the voting power of another person in a statewide election merely because he

13   lives in a rural area or because he lives in the smallest rural county?").

14         Thus, the Supreme Court has subsequently described the "defect" at issue in

15   *Gray* as "the denial or dilution of voting power because of . . . geographic location."

16   *Gordon v. Lance*, 403 U.S. 1, 4 (1971).  Discussing the footnote relied on by

17   Plaintiffs, the Court explained:

18         [I]n *Gray*, . . . , 372 U.S., at 381 n.12, . . . we h[e]ld that the county-
         unit system would have been defective even if unit votes were
19         allocated strictly in proportion to population.  We noted that if a
         candidate received 60% of the votes cast in a particular county he
20         would receive that county's entire unit vote, the 40% cast for the other
         candidates being discarded.  *The defect, however, continued to be*
21         *geographic discrimination.*  Votes for the losing candidates were
         discarded solely because of the county where the votes were cast.
22         Indeed, votes for the winning candidate in a county were likewise
         devalued, because all marginal votes for him would be discarded and
23         would have no impact on the statewide total.

24   *Gordon*, 403 U.S. at 4-5 (emphasis added).  The Ninth Circuit has also described

25   *Gray* as standing for the proposition that "a state may not *allocate representation*

26   *differently* based on a voter's county of residence."  *Short v. Brown*, No. 18-15775,

27   2018 WL 3077070, at *5 (9th Cir. June 22, 2018) (emphasis in original).  *Gray* is a

28

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

case about geographic discrimination,[3] and Plaintiffs have not alleged that California discriminates against Plaintiffs on the basis of geographic location.[4]  Nor could they.  *Gray* in no way erodes the precedential effect of the Court's summary affirmance in *Williams*, which presented a challenge to an electoral scheme that is substantively identical to the one at issue here.

## B.   California's Method of Selecting Presidential Electors Satisfies "One Person, One Vote" Principles.

Even if binding Supreme Court precedent did not foreclose Plaintiffs' one person, one vote claim, it would fail on its own terms.  Plaintiffs do not allege that California weighs votes for presidential electors differently depending on where the voter lives.  Instead, Plaintiffs' "primary argument" is that "the [winner-take-all] method, by discarding votes at the first step of a two-step election for President, violates one person, one vote and the Fourteenth Amendment."  Opp. at 16.  This argument simply ignores the power constitutionally delegated to the States to allocate their presidential electors at their discretion, and has no support in equal protection jurisprudence.  Plaintiffs compound these errors by misconstruing the case law regarding multimember district elections, which are not at issue here.

### 1.   The "Two-Step" Theory Ignores Constitutional Procedures For the Selection of the President and Raises a Non-Justiciable Political Question.

To support their assertions that plurality voting for a State's presidential electors violates one person, one vote requirements, Plaintiffs say California is conducting a two-step election, and then accuse California of "discarding" votes at

---

[3] This is the same approach taken by the plaintiff in *Graham*, who "argue[d] that under *Gray* it is impermissible to discard or 'wash out' losing votes at a stage prior to actual nomination."  *Graham*, 403 F. Supp. at 43, n. 25.  The *Graham* Court rejected this argument, citing *Gordon*, 403 U.S. at 5.  *See* 403 F. Supp. at 43, n. 25.

[4] Although Plaintiffs maintain that they have plausibly alleged geographic discrimination because "Republican voters who live in California have their votes completely discarded *because* they live in California" (Opp. at 10), this is based on a fundamental misunderstanding of what it means to allege geographic discrimination.  California does not, and cannot, assign a higher value to votes cast by persons who live outside of California (or within particular areas of the State).

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

the first step of the election.  As noted above, this theory is based on footnote 12 of the *Gray* majority opinion, which described the county unit system as involving the "weighting of votes," with any votes for the losing candidate "being worth nothing and being counted only for the purpose of being discarded."  372 U.S. at 381, n. 12. According to Plaintiffs, *Gray* struck down this "two-step" process and, by extension, California's, as well.  Opp. at 9; *see also* Opp. at 18.

Even if this were an accurate reading of *Gray* (and as explained above, it is not), Plaintiffs' "two-step" theory fails because California only conducts one election with respect to presidential candidates, and it equally counts all of the votes cast in order to determine the winner of that election.  The argument that California is "discarding the votes of millions of Californians in each election cycle before those votes can affect the actual Presidential race" (Opp. at 6) ignores the fact that, under the Constitution, the votes cast in California can *only* count for the purpose of selecting California's presidential electors.  U.S. Const. amend. XII; *id*. art. II, § 1, cl. 2.

The "two-step" theory also fails insofar as it ignores the constitutional provisions governing the selection of presidential electors and the structure of the Electoral College.  According to Plaintiffs, it is now widely accepted that electors are a mere formality with no actual impact on the selection of the President.  Opp. at 8.  Plaintiffs also contend that Defendants "are wrong in viewing modern elections as votes for Electors rather than for President," and that in modern elections the selection of electors is only an "intermediate step in the election of the President and [is] nothing more than a mechanism for counting the people's vote." *Id*. at 6, 8.  These arguments directly conflict with the constitutional framework governing the Electoral College, which of course requires the use of presidential electors.  U.S. Const. amend. XII; *id*. art. II, § 1, cl. 2.

Inherent in the "two-step" theory is the assumption that the winner of the national popular vote must win the presidency, and that presidential electors are

1   nothing more than an outdated and inconvenient fiction.  To the contrary, the

2   Constitution provides each State with the power to act as a sovereign, independent

3   entity, within the larger structure of the Electoral College.  Each State has "plenary"

4   authority to determine the manner of appointing its presidential electors, which in

5   turn constitute the Electoral College through which the president is selected.

6   *McPherson*, 146 U.S. at 35; U.S. Const. amend. XII; *id.* art. II, § 1, cl. 2.  And, if no

7   candidate receives a majority of Electoral College votes, the selection of the

8   president is determined by the House of Representatives, in a process through

9   which "[t]he state acts as a unit, and its vote is given as a unit, but that vote is

10  arrived at through the votes of its representatives in congress elected by districts."

11  *McPherson*, 146 U.S. at 27.  Plaintiffs' one person, one vote arguments ignore these

12  fundamental features of the constitutional framework for selection of the president.

13      In sum, Plaintiffs' "two-step" theory does not recognize the power of each

14  State to act as politically sovereign, individual units, and to select its presidential

15  electors at its discretion—which includes the power to award all of its electors to a

16  single presidential candidate.  The theory also ignores the essential role that electors

17  play in the presidential selection process.  By failing to acknowledge these basic

18  constitutional features, Plaintiffs are challenging the very system for electing

19  presidents established by the Constitution.  As explained in the opening brief, such

20  a challenge presents a non-justiciable political question.  *See* Opening Br. at 22-25.

21  The Court should reject the "two-step" theory as fundamentally flawed, both

22  factually and legally.

## 2. The multimember district cases are not relevant, and in any event are distinguishable.

25      The multimember district cases cited by Plaintiffs have no relevance to the one

26  person, one vote claim.  A multimember district is one in which multiple candidates

27  are elected, usually based on plurality voting.  But because California awards all of

28  its electors to the presidential candidate that wins a plurality of the popular vote in

California, the election is held in order to determine one winning presidential candidate. It is not held in order to constitute a multimember, state-level body of electors representing various constituencies, because it is not possible for electors for multiple presidential candidates to be selected as the winners of the election.

Even if an analogy to multimember district cases could be fairly drawn, the case law does not help Plaintiffs. The language cited by Plaintiffs from *Fortson v. Dorsey*, 379 U.S. 433 (1965), and *Burns v. Richardson*, 384 U.S. 73 (1966)—that multimember schemes can be invalid if they "operate to minimize or cancel out the voting strength of racial or political elements of the voting population"—does *not* mean that plurality voting for multimember bodies is constitutionally suspect when the minority party does not win any seats. Opp. at 12 (quoting *Burns*, 384 U.S. at 88, and *Fortson*, 379 U.S. at 439). In fact, the Supreme Court has specifically rejected any such theory. *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971) (finding no equal protection violation from failure to award legislative seats to losing candidates). The Supreme Court has also held that in order to sustain a challenge to multimember districts, "it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential." *White*, 412 U.S. at 765-66. Rather, there must be evidence that "the political processes leading to nomination and election were not equally open to participation by the group in question . . . ." *Id.* at 766. Accordingly, *White* struck down two specific multimember districts based on findings of "official racial discrimination" implicating the right to vote, as well as "invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others." *Id.* at 766-771.

Plaintiffs have not alleged anything close to this type of discrimination. Although they call California's plurality voting approach a "tool of discrimination," Plaintiffs only point to several recent elections in which California's electoral votes have been awarded to the Democratic presidential candidate. Opp. at 11, 13. This

falls far short of alleging discrimination.  *See* Opening Br. at 13-16.  California has used plurality voting in awarding its presidential electors ever since 1852, in its first presidential election after joining the Union.  Cal. Stats. 1852, Ch. 72.  And, over the past eighty years, in nine out of the last twenty-one presidential elections, California's electoral votes were awarded to the Republican candidate for president.[5]  This is hardly reflective of a pervasive history of discrimination against the Republican Party in California—or anyone.  Plaintiffs also fail to distinguish or even address the numerous decisions holding that plurality voting poses no constitutional concern.  *See* Opening Br. at 13-16.  The one person, one vote claim therefore has no basis in the multimember district election case law, or any other body of cases.

## II.  PLURALITY VOTING IN THE SELECTION OF PRESIDENTIAL ELECTORS DOES NOT VIOLATE ASSOCIATIONAL RIGHTS OR ANY OTHER FIRST AMENDMENT RIGHTS.

### A.  To the Extent Plaintiffs Have Properly Raised Speech and Petition Claims, Those Claims Fail as a Matter of Law.

Plaintiffs use their opposition brief to expand their First Amendment claim beyond the allegations of the Complaint.  "Count II" of the Complaint refers to a "severe burden on Plaintiffs' rights to associate and to effectively express their political preference through voting . . . ."  Compl. ¶ 58.  The opposition brief goes beyond that and describes the First Amendment claim as encompassing two additional violations, of speech and petition rights.  *See* Opp. at 1 ("the voting, speech, associational, and petition rights of California voters"); 30 ("rights to

---

[5] National Archives and Records Administration, U.S. Electoral College, Historical Election Results, Electoral Votes for President and Vice President, 1936-2016: https://www.archives.gov/federal-register/electoral-college/votes/1929_1941.html; https://www.archives.gov/federal-register/electoral-college/votes/1941_1953.html; https://www.archives.gov/federal-register/electoral-college/votes/1953_1957.html; https://www.archives.gov/federal-register/electoral-college/votes/1965_1969.html; https://www.archives.gov/federal-register/electoral-college/votes/1977_1981.html; https://www.archives.gov/federal-register/electoral-college/votes/1993_1997.html; https://www.archives.gov/federal-register/electoral-college/votes/2000_2005.html.

effectively vote, associate, and petition candidates"); 23 ("Plaintiffs' right to petition their elected representatives"); and 26 (reference to "incentive structures that operate to burden speech indirectly"). However, the Complaint does not allege sufficient facts in support of such claims.

The speech claim—as articulated in the opposition brief—appears to be that California's plurality voting system constitutes an "incentive structure[] that operate[s] to burden speech indirectly." Opp. at 26. Plaintiffs have not presented plausible factual allegations to this effect. The case on which Plaintiffs rely to make this argument involved a challenge to a public campaign financing system in which spending by self-financed candidates directly resulted in an increase in public financing for candidates participating in the public financing system. *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011). The Court concluded there that this "imposes an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right[s]," because "the vigorous exercise of the right to use personal funds to finance campaign speech" leads to "advantages for opponents in the competitive context of electoral politics." *Id*. at 736 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008) (alterations in original)). The burden on speech resulted from the penalty that was imposed for exercising one's speech rights. Here, Plaintiffs have identified no penalty that they (or anyone) might suffer for exercising their speech rights.

The petition claim as articulated in the opposition brief appears to be that California infringes upon Plaintiffs' right "to petition the Executive Branch for relief, by rendering votes of individuals who do not support the Democratic candidate all but irrelevant in the final vote-count for President." Opp. at 2. Plaintiffs appear to contend that any law that impacts their ability to express their "ideas, hopes, and concerns" to *candidates* for president and vice president necessarily violates their right to petition the government. *Id*. at 23. However, the right to petition as recognized by the Supreme Court is "the right of individuals to

1   appeal to courts and other forums established by the government for resolution of

2   legal disputes."  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

3   Plaintiffs have not alleged any impediments on their access to such governmental

4   forums.  The petition claim thus fails as a matter of law.

### B.   Any Burden on Associational Rights Is Minimal or Non-Existent, So Strict Scrutiny Does Not Apply.

7   Plaintiffs' associational rights claim is based on mere assertions that plurality

8   voting for the selection of a State's presidential electors violates the right to cast an

9   effective vote.  Plaintiffs offer no legal authorities establishing that an election in

10  which all votes are counted equally can nevertheless violate such a right.

11  According to Plaintiffs, the "right to cast an effective vote" is a right to have

12  one's vote "translated into concerted action, and hence to political power in the

13  community."  Opp. at 24 (quoting *Tashjian v. Republican Party of Connecticut*, 479

14  U.S. 208, 216 (1986)).  But the right at issue in *Tashjian* was the right to actually

15  vote in an election.  Plaintiffs do not, and cannot, allege that they are being

16  prevented from registering to vote or voting for their preferred candidates.  Nor do

17  Plaintiffs allege that their preferred candidates have been prevented from appearing

18  on the ballot, as in the other case Plaintiffs rely upon, *Williams v. Rhodes*, 393 U.S.

19  23, 24 (1968).

20  Plaintiffs also argue that their right to have candidates pay equal attention to

21  California voters has been violated, and that it is constitutionally improper for

22  California to "incentivize" presidential candidates to ignore California voters.  Opp.

23  at 25.  Even if Plaintiffs could articulate some viable theory of standing to press this

24  claim, and they cannot,[6] their theory has no support in First Amendment

---

[6] In order to establish standing, Plaintiffs must allege an injury-in-fact that is caused by California's actions, and that could be redressed by a judgment in their favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (the "irreducible constitutional minimum" required to establish a "case or controversy" consists of a concrete "injury in fact"; a causal connection between the injury and defendants conduct; and a likelihood that the injury will be redressed by a favorable decision).

jurisprudence on associational rights.  Plaintiffs make vague references to theories of political responsiveness and incentive structures (Opp. at 24-25), but these theories have no application here.  The reference in *McCutcheon v. Federal Election Commission* to the "political responsiveness at the heart of the democratic process" was made in the campaign finance context, in a case in which the Court also observed, "[n]o matter how desirable it may seem, it is not an acceptable governmental objective to 'level the playing field,' or to 'level electoral opportunities," because "[t]he First Amendment prohibits such legislative attempts to 'fine-tun[e]' the electoral process, no matter how well intentioned."  134 S.Ct. 1434, 1461, 1450 (2014) (citation omitted).  Nothing in *McCutcheon* establishes First Amendment protections for Plaintiffs' supposed "interest in receiving campaign attention" (Opp. at 26), and it certainly does not support a right to a level playing field or equal opportunities in terms of receiving attention from political candidates.

Plaintiffs have failed to even articulate a potential violation of associational rights as recognized by the courts.  Because the Complaint contains no plausible allegations of unequal weighting of votes, discrimination among voters, or obstruction or impediment to voting, any burden on First or Fourteenth Amendment rights, "[i]f [it] exists at all . . . it is at best very minimal."  *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1027 (9th Cir. 2016).  Strict scrutiny thus does not apply and the Court need only determine if California's important regulatory interests justify the use of plurality voting.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

---

Plaintiffs cannot allege facts sufficient to meet those required elements, because California has no control over the amount of "campaign attention" that any political party pays to California.  Such decisions are made by the major political parties and the candidates themselves, and the attention paid to California voters varies from election to election depending on a myriad of factors over which California has no say.  For the same reason, no injunction could effectively ensure that campaigns pay sufficient attention to California voters to satisfy Plaintiffs' concerns.

### C.   Plurality Voting Is Justified by Important Regulatory Interests.

California's important regulatory interest in the use of plurality voting for the selection of presidential electors is its interest in maximizing the impact of the State's electors within the Electoral College.  This is the very same interest recognized in *Williams*.  *See Williams v. Virginia State Bd. of Elections*, 288 F. Supp. at 628; Opening Br. at 20-21.  Because the burden on associational rights is "so slight"—if one exists at all—this interest is more than enough to justify California's use of plurality voting in the selection of presidential electors.  *Short*, 2018 WL 3077070, at *6 (holding that "California's general interest in increasing voter turnout and specific interest in incremental election-system experimentation adequately justify" challenged law).

Plaintiffs argue that an interest in "maximizing the power of a plurality political party by discarding the votes of the minority" is "not a legitimate state interest."  Opp. at 28-29.  But California's interest is in maximizing the power of California's electoral votes, regardless of whether those votes go to a candidate from a particular political party.  And even if it were accurate to characterize plurality voting as resulting in the "discarding the votes of the minority," under the *Burdick* balancing test this would not play a role in determining whether the interest asserted by the State is a legitimate or important one.  Rather, it would be considered when determining whether a burden on associational rights exists—and as explained above, no such burden exists because all votes are counted equally, and no votes are "discarded."  *See Dudum v. Arntz*, 640 F.3d 1098, 1109-10 (9th Cir. 2011) (rejecting argument that votes for losing candidate are "discarded").

The observation in *Anderson*—that a State "has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries"—does not mean that a State has no interest in regulating presidential elections.  Opp. at 27 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983)).

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)

The language that Plaintiffs quote is from the Court's discussion of whether the challenged restriction (an early filing deadline for independent presidential candidates) burdened associational rights. *Anderson*, 460 U.S. at 795. This observation was not made in the context of determining whether the State had an important regulatory interest sufficient to justify the challenged law. *See id*. at 796. And even if a State's interest in regulating presidential elections is comparatively less substantial than its interest in regulating statewide or local elections, each State still has a compelling interest in controlling the manner in which its preferences for president are expressed within the Electoral College. The Constitution confirms as much by giving the power to determine the manner of selecting presidential electors to the States. U.S. Const. art. II, § 1, cl. 2.

Plaintiffs are also mistaken in asserting that the *Burdick* test cannot be conducted on the pleadings. Opp. at 28. The Ninth Circuit recently applied the *Burdick* balancing test and affirmed a district court decision resolving an associational rights claim on the pleadings, with no discovery. *Pub. Integrity All., Inc.*, 836 F.3d 1019; *see also Pub. Integrity All., Inc. v. City of Tucson*, No. CV 15-138-TUC-CKJ, 2015 WL 10791892 (D. Ariz. May 20, 2015). California's interest in maximizing the effect of its presidential electors has been recognized as an important government interest and is firmly rooted in the Constitution. Given that the Complaint alleges a minimal to non-existent burden on associational rights, the Court can easily find on the pleadings that California more than satisfies the *Burdick* balancing test. *See Pub. Integrity All.*, 836 F.3d at 1027.

## III. CONCLUSION

For the foregoing reasons, and for the reasons stated in the opening brief, the complaint should be dismissed without leave to amend.

1   Dated:  June 26, 2018

2                                                    Respectfully submitted,

3                                                    XAVIER BECERRA
                                                     Attorney General of California
                                                     PAUL STEIN
                                                     Supervising Deputy Attorney General

4

5

6                                                    _____/s/ P. Patty Li_____

7                                                    P. PATTY LI
                                                     Deputy Attorney General
                                                     *Attorneys for Defendants Edmund G.
                                                     Brown Jr. and Alex Padilla*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reply Brief in Support of Motion to Dismiss
(2:18-cv-01422)